WATSON, State Engineer v. DESERET IRRIGATION CO.
et al.

No. 6860.   Decided June 18, 1946.   (169 P. 2d 793.)

See 67 C. J., Waters, sec. 1073; 41 Am. Jur. 495.

*Cheney, Jensen, Marr & Wilkens*, of Salt Lake City, for appellant.

*Edward W. Clyde*, of Salt Lake City, *Sam Cline*, of Milford, *Elias Hansen*, of Salt Lake City, and *Dudley D. Crafts*, of Delta, for respondent.

LARSON, Chief Justice.

Action by the State Engineer for a Declaratory Judgment construing an agreement entered into by the Piute Reservoir and Irrigation Company and the Sevier Bridge Reservoir owners October 18, 1938, with reference to the water of Sevier River. The State Engineer is virtually a nominal party, the real controversy being between Piute Reservoir and Irrigation Company, defendant and appellant, and Sevier Bridge Reservoir Owners, defendants and respondents. Hereinafter appellants will be referred to as Piute, and respondents as Sevier. Piute maintains a storage reservoir on Sevier River above Marysvale. Further down the river, approximately 82 miles as the water flows, Sevier maintains a storage reservoir. Both are maintained for storage of irrigation waters, and are subject to the direct flow primary rights on the river. This action is concerned only with these storage waters.

There had been considerable litigation over the waters of the river, and, on November 30, 1936, the District Court of Millard County in the case of *Richlands Irrigation Company* v. *Westview Irrigation Company et al.*, made a general adjudication of the waters of the river. This decree provided that beginning with October 1st of any year and ending with October 1st of the succeeding year of the water available for storage after satisfying primary rights, Sevier was to receive 89,280 acre feet of water as a first priority; Piute was then to receive 40,000 acre feet as the second priority. After satisfying these priorities and amounts then of the next 32,000 acre feet 75% was allocated to Sevier

and 25% allocated to Piute; of the next 13,720 acre feet, Sevier should take all. The next 75,000 acre feet was allocated, Piute 25% and Sevier 75%. The Decree further provided that as far as practicable, storage in both reservoirs should be concurrent, but because Piute reservoir is located above Sevier reservoir, water should be held in Piute reservoir as long as possible in order that the make of the river below Piute dam, in excess of primary rights, may be given as long a time as possible to supply Sevier's priority. To clarify this provision the Decree provided that water need not be released from Piute reservoir for transmission to Sevier until after the 15th day of April of each year. Because while water could be released from Piute to Sevier, once the water had passed Piute dam, it could never be recovered by Piute and large quantities of water needed to fill Sevier's first priority was often stored in Piute reservoir until after April 15th in order that Piute would be certain to have in its reservoir all the water to which they were entitled.

So at times it developed that water which had been impounded in Piute reservoir must after April 15, be let down to Sevier to satisfy its first priority of 89,280 acre feet. Due to the fact that there was then a greater loss in seepage and evaporation than during the winter months, and by April 15 water for irrigation purposes was being diverted through numerous canals from the river between the dams, and it was difficult to keep such canal diversions from drawing off part of the waters let down for storage at Sevier, it was necessary in order to meet Sevier's priority to let down from Piute dam a much greater quantity of water than would reach Sevier. This difference as loss in transmission was estimated by the Commissioner at 30%. The net result was that both parties hereto were suffering a loss of water in their respective storage rights. In dry years when the flow available for storage was less than the first priorities of 89,280 acre feet to Sevier and then 40,000 acre feet to Piute, all losses in transit from Piute to Sevier would fall first and most heavily upon Piute, and may also

directly affect Sevier. In years when those first priorities were filled, the same situations with respect to losses in transit may arise as to the next 32,000 acre feet which were allocated 75% to Sevier and 25% to Piute; and so on as to all subsequent allocations between these parties. Difference between the parties over such matters resulted in litigation in 1937. In 1938 Piute and Sevier, in an effort to prevent litigation and adjust the difficulties, entered into the agreement involved in this action.

This agreement was an endeavor to work out a plan of distribution whereby the water stored in Piute reservoir could be released to the Sevier reservoir at such times and in such quantities as to prevent loss of water. It provides that the River Commissioners operating under the direction of the State Engineer shall on and after January 1st of each year, release from Piute reservoir for transmission to Sevier reservoir so much of the water accumulated from the storage filings as was necessary to satisfy the priority of Sevier without jeopardizing the water allocated to Piute under the decree. The agreement provided that if more water reached Sevier than had been awarded it under the decree, Piute under certain conditions was to receive credit therefor the following year as against Sevier's first priority of 89,280 acre feet.

During the years of 1938-39-40 and 41 the River Commissioners operated and controlled the reservoirs under the Agreement without material controversy; they measured the water April 15th of each year, as provided by the decree, and gave Piute its credit if entitled to any the following year as was provided by the agreement.

In 1943 by March 30th, both Sevier and Piute had in their respective reservoirs more water than their respective first priorities. Such excess storage plus the make of the river after that date and available for storage, became part of the waters constituting the subsequent priority on the stream, allocated by the decree as 75% to Sevier and 25% to Piute. Of the water thus available under such allocations Sevier received 13,280 acre feet over its allocated 75%. In

1944, Piute claimed a credit for this amount less reservoir deductions, against Sevier's first priority of 89,280 acre feet. Sevier resisted allowance of the credit, and the Engineer brought this action for a declaratory judgment construing the agreement between the parties as to when such credits were to be allowed Piute.

At the inception of this action Piute apparently took the broad view that under the agreement it was entitled to credit against Sevier's first priority of 89,280 acre feet for any and all waters available for storage which the previous year reached Sevier reservoir, in excess of Sevier's allocated quantities or proportions less reservoir deductions. As Sevier construed the agreement, Piute was only entitled to credit for waters which Sevier received in excess of its quotas due to error of the Commissioners in underestimating the make of the river below Piute dam, and therefore allowed too much water to flow down to Sevier from Piute reservoir.

After hearings were had the district court filed a memorandum decision which indicated holdings favorable to Piute. Before formal findings and judgment were entered, Sevier requested leave, and over objections of Piute were permitted to reopen the case, file amended pleadings and offer further testimony. On April 23, 1945, the trial court entered its Findings of Fact, Conclusions of Law and Decree from which Piute appeals, and presents the following questions:

1. Was it error to permit Sevier to reopen the case and amend its pleadings after the court's memorandum decision?

2. Did the amended pleadings, filed after the case had been submitted and a memorandum decision filed by the court, set up a new and different theory of the case?

3. Under the agreement of October 18, 1938, to what waters, and to what extent may Piute claim a credit against Sevier the following year?

Questions 1 and 2 are so closely related that we answer them together. That the court may allow amendment to pleadings under circumstances as was done here if the

amendments do not set up a new and independent cause of action is settled by prior decisions of this court. *Hartford Accident & Indemnity Co.* v. *Clegg*, 103 Utah 414, 135 P. 2d 919; *Larson* v. *Gasberg*, 43 Utah 203, 134 P. 885; *Peterson* v. *Union Pacific R. Co.* 79 Utah 213, 8 P. 2d 627. The amendments allowed in the instant case did not change the questions or issues to be determined. If they made any changes at all except in verbiage, it was merely to expand and amplify what was alleged in the original pleading. The action was instituted by the State Engineer for a judgment construing section 2 of the agreement of October 18, 1938, as to the circumstances and conditions under which Piute was entitled to "credits" for water in Sevier reservoir. There was no change as to that issue nor as to the respective position of the parties with regard to their construction and meaning of the agreement on that question. Piute was given full opportunity to present further evidence and argument on the matters involved. Under the Peterson and the Hartford Accident cases cited supra, question 2 must be resolved against appellant.

3. Under the agreement of October 18, 1938, what are Piute's rights as to "credits" against Sevier? That is the heart of this lawsuit, and involves the construction of Section 2 of the agreement. We set out the parts of the contract that may be helpful in the consideration of this question.

The Witnesseth Clause declares that the purposes of the agreement are: to lessen and decrease losses in the water in transmission from Piute reservoir to Sevier reservoir; and to facilitate the allocation of waters of Sevier River as between Sevier and Piute as provided in the decree.

Section 2 of the agreement reads:

"In order further to decrease or lessen losses in transmission of waters between Piute Reservoir and Sevier Bridge Reservoir, and to facilitate the allocation of the waters between said reservoirs year after year, the Sevier Bridge Reservoir Owners agree with Piute Company as follows: (a)—The *River Commissioner or Commissioners,* under the direction of the State Engineer of the State of Utah, *shall,*

on and after January 1st of each year, *release from Piute Reservoir for transmission to Sevier Bridge Reservoir so much of the water accumulated or accumulating* from the storage filings set out on page 185 of the decree of November 30, 1936, in Piute Reservoir, *as may be released without jeopardizing the receipt and use by the Piute Company of the water allocated to it* under said decree and under the provisions of this agreement, *not exceeding,* however, *such an amount as* in the judgment of said officials *will, with anticipated accretions from below said reservoir, deliver into* the *Sevier* Bridge *Reservoir the water* to *which Sevier* Bridge Reservoir *shall be entitled* under said decree. (b)—*If in any year the Sevier Bridge Reservoir shall have received more than its proper proportion of the storage waters* of the Sevier River allocated to it under said decree, *whether from excessive release of water from Piute Reservoir, or from accretions to the river below Piute Reservoir exceeding the amount for which allowance had been made, or from any holdover water belonging to the Piute Company by reason of its being a stockholder of the Deseret Company,* such excess water, whether held in Sevier Bridge Reservoir or used by the Sevier Bridge Reservoir Owners, *shall be credited* (less its proper proportion of loss as hereinafter provided) *to Piute Company, and be accounted as a part and as satisfying to that extent the first priority of the Sevier* Bridge Reservoir *for the said following year,* and the said Piute Company shall be, during said following year, entitled, by reason of such credit to withhold, store and use from waters accruing under said storage filings, an amount of water equal to the amount of water so received in the Sevier Bridge Reservoir, less said deduction, before the owners of the Sevier Bridge Reservoir shall be entitled to receive any waters accruing from said storage filings to satisfy the balance of its first priority of 89,280 acre feet for said year.

"3. Each of the parties hereto who may hold over any water in Sevier Bridge Reservoir, as herein provided, shall bear his or its proper proportion of the reservoir loss. The reservoir loss for the holdover period shall. be properly computed by the River Commissioner or Commissioners under the supervision of the State Engineer, and shall be applied uniformly and proportionately against all water so stored." (Italics ours.)

The parties are agreed that Piute has no general storage rights in Sevier Reservoir; that is, it cannot of its own volition run its waters down to Sevier reservoir and store them there, and then at its pleasure in future years withhold from the flow of the river at Piute Reservoir water which should flow down to Sevier. They also agree that Piute is not to be held to have lost its right to *all* water which

passes the Piute dam. The waters to which Piute is entitled under the general adjudication decree of 1936, reaching Sevier reservoir and which Piute may offset the following year by withholding waters to which Sevier would be entitled under its first priority, are set forth by three classes or sources in the first sentence of subdivision (b) of Section 2 of the Agreement. Such excess waters (waters belonging to Piute) received by Sevier at its reservoir may consist of: Source 1—waters released from Piute Reservoir; Source 2 —accretions to the river below Piute Reservoir; Source 3— such part of the waters of the Deseret Irrigation Company, which had storage rights in Sevier reservoir, as Piute by reason of being a stockholder in the Deseret Company, would have been entitled to draw from the Sevier reservoir and which it did not draw but held over to the following year may be used as a credit or offset against Sevier the spring following the nonuse; as to this right there is no dispute between the parties, and therefore no further reference to it will be made.

The first source which forms one of the bones of contention is "excessive release of water from Piute reservoir." Sevier contends that this "excessive release of water" applies only to a situation where the Commissioners estimated the make of the river below Piute dam as insufficient to supply Sevier's priorities, and then to make up the estimated deficiency in Sevier's supply released from Piute Reservoir more water than was necessary to make up the actual deficiency. That in effect means that the first two classes or sources mentioned above in this opinion are to be construed together as one, notwithstanding they are separated by the disjunctive *or* in the agreement. Piute argues that regardless of the cause for which the water which should belong to Piute is released at Piute dam, such amount thereof as reaches Sevier reservoir, less storage losses, shall stand as a credit for Piute against Sevier the following season. As shown by the factual statement supra, in 1943, the first priority, Sevier's 89,280 acre feet, had been satisfied: the second priority, Piute's 40,000 acre feet, was also satisfied;

and the parties were receiving the subsequent or pro rata priorities. On April 12 the water in Piute reservoir reached the 76 foot contour and was not permitted to raise above that point. Realizing that the make of the river above Piute dam would be more than Piute Reservoir would impound at its 76 foot contour the Commissioners prior to April 12, allowed 9,900 acre feet to by-pass Piute dam, of which 3,847 acre feet reached Sevier reservoir in excess of its allocations and is part of the 13,226 acre feet involved in this dispute. The balance of the 13,226 acre feet, to wit 9,379 acre feet, is the proportion of the make of the river below Piute dam, which the writer thinks was allocated to Piute by the Decree. In 1944, Piute asserted a credit against Sevier for 3,847 acre feet as resulting from "an excessive release of water from Piute reservoir," and to 9,379 acre feet as belonging to Piute from accretions to the river below Piute dam.

As to the 3,847 acre feet, Sevier contends this was not the release of an excessive quantity of water from Piute reservoir, but the natural flow of the river over and above Piute storage capacity, That Piute is limited in its storage rights to the amount of its available storage capacity; that the reservoir was full and this water is to be considered, not as water released from Piute but as water going over the spillway. Piute counters that at the time this water was permitted to pass Piute dam the reservoir was not full, and that even if it subsequently filled, this 3,847 acre feet was released from Piute reservoir and therefore should stand as a credit for Piute. The agreement recognizes no credit rights in Piute for waters forming above Piute dam and which by-passes the dam when the reservoir is full. Piute would have the right to use the water or to store it but not in Sevier reservoir, so the claim on this ground must be disallowed. Piute also argues that its reservoir was not full. The reservoir had storage capacity to the 80 foot contour, and it is admitted that the water level was held at the 76 foot contour; had the Commissioners not released water above the dam until the 80 foot contour was reached

this 3,847 acre feet would have been stored in the reserovir and therefore it constitutes an "excessive release" of water. Sevier answers, and the trial court so found, that the waters of Piute reservoir were held at the 76 foot contour at the express orders and direction of Piute, because waters impounded above the 76 foot countour would flood private lands over which Piute had no flood rights and subject the company to damage suits. This finding by the court is amply sustained by the evidence. While this 3,847 acre feet was water allocated to Piute by the decree, which Piute could use or store wherever it had capacity, it is not waters for which Piute can claim credit against Sevier as resulting from "excessive release of waters from Piute reservoir." As to waters forming above Piute dam, the agreement allows Piute credit against Sevier, only for such waters as are permitted to by-pass the Piute dam and reach Sevier, in years when Piute has available and usable storage capacity which it desires to use.

As to the 9,379 acre feet, Piute claims credit for this amount under that provision of the agreement designated as source 3 as Piute's share of the accretions to the river below Piute dam after all prior rights were satisfied, that is, accretions to the river below Piute reservoir, available for storage, exceeding the proportion of such waters to which Sevier was entitled under the decree. Prior to the making of the agreement of October 18, 1938, all the make of the river below Piute dam, and available under the storage filings went into Sevier reservoir, and such proportions thereof as the decree awarded to Piute was lost to it, because it had no way of getting such water up into its reservoir. To safeguard Piute in this regard as far as practicable, the decree provided that Piute could hold at its reservoir the entire flow of the river above its dam until April 15th. If on that date Sevier had not received its priorities and proportions, Piute must release from its reservoir enough water to deliver into Sevier reservoir the amount it was shy on its priorities on April 15th. Such released water suffered a loss of at least thirty per cent in

transit, so Piute was compelled to release almost fifty per cent more water than reached Sevier. This often caused a loss of water to both parties sometimes on their first priorities, and sometimes on the later priorities and allocations. As a result disputes and difficulties arose as to quantities of water each received, as to who should stand the loss, and as to when and if Piute should let the water down to Sevier. When the agreement was made, the parties, mindful of these practical difficulties, provided that in order to save this transmission loss, if Piute would open the gates at its dam to insure Sevier getting its first priority without this big transmission loss, Sevier would for a one year period protect Piute in its rights in the make of the river below Piute dam. Thus instead of Piute holding at its reservoir over its quota enough water to offset such water as Piute might be entitled to receive from the make of the river below Piute dam and which flowed into Sevier reservoir, Sevier agreed to let Piute withhold such amount less reservoir losses the following year. This would tend to remove difficulties resulting from the uncertainties in the make of the river each year, by equalizing on a two year basis. The language of the agreement is that Piute should have credit for excess water received by Sevier from "accretions to the river below Piute Reservoir exceeding the amount for which allowance had been made." Sevier now contends that this means *exceeding the estimated shortage of the make of the river below the dam to fill Sevier's first priority; and to make up which shortage, waters had been released from Piute Reservoir.* Such construction means that credit for such accretions would be the same as the credits for "excessive release of water from Piute Reservoir" although the two are separated in the agreement by the disjunctive *or*, signifying a separate or different thing or class. We have already held that the language "excessive release of waters from Piute Reservoir" dealt with such credits. We conclude both from the language of the instrument and from the oral testimony received by the court, that Piute is entitled to credit against Sevier for waters allocated to Piute by the decree from the make

of the river below Piute dam, and which Sevier uses the year of its flow or which is available for use of Sevier the following season. The language "exceeding the amount for which allowance has been made," allows Piute credit for its proportion of the make of the river below the dam against which it had not been allowed to withhold waters forming above the dam either because the waters had been let down over the dam, or because there was no water forming above the dam that could be withheld in Piute. The 9,379 acre feet involved in this dispute flowed into Sevier Reservoir at a time when Piute Reservoir was full to the 76 foot contour. Therefore it was not water for which Piute was entitled to credit against Sevier. In the writer's opinion Piute should be given credit for such excess waters reaching Sevier reservoir only when Piute has unused storage capacity available in its reservoir where it could have stored such water had it been made above the dam. When Piute had no storage capacity available, the waters forming below the dam are in the same situation as the waters forming above the dam. Piute is not entitled to credit against Sevier for any excess waters received by Sevier at such time as Piute Reservoir is full.

During the trial the court received oral evidence from both sides as to circumstances under which the agreement was made, and the negotiations which culminated in the agreement. The receipt of this evidence is assigned as error. We think the written instrument is clear enough in its terms and purports, and lends itself reasonably only to the construction given above. If, however, the parol evidence is considered it impels the same interpretation and construction we have given the instrument. Since the result must be same with or without the parol evidence its receipt was in no way prejudicial.

The writer thinks the decree of the trial court was in error in the particulars indicated in this opinion. The majority of the court thinks the decree should be affirmed. It is therefore ordered that the decree be and same hereby is affirmed—each party to bear their own costs.

WADE, Justice (concurring in result).

I agree with the prevailing opinion that the court properly allowed Sevier to amend its pleadings and reopen its case. The rule on when amendments may be made is correctly stated in *Hartford Accident & Indemnity Co.* v. *Clegg*, 103 Utah 414, 135 P. 2d 919.

I agree that the finding of the trial court that the waters of the Piute Reservoir were held at the 76 foot contour at the express orders and direction of Piute, because water impounded above the 76 foot contour would flood private lands, is supported by a preponderance of the evidence. I agree that the waters which were released at the order of Piute which it had the capacity to store in its reservoir were waters which were allocated to Piute under the decree, but that Piute was not entitled to credit for such waters as a part of the first priority of Sevier Bridge Reservoir for the following year because it was, under the contract, entitled to such credit only to such waters as should be released by the River Commissioners pursuant to the provisions of Section 2; subdivision (a) of the contract, for the purpose of transferring from Piute to Sevier before the irrigation season commenced, the waters which the commissioners estimated Sevier would be entitled to for such year. This water clearly does not come under that provision of the contract and therefore Piute was not entitled to credit out of Sevier's first priority for the following year.

I agree with the interpretation placed thereon by Mr. Justice WOLFE, on the word *or* in the provision in the contract reading

"Whether from excessive release of water from Piute Reservoir, *or* from accretions to the river below Piute Reservoir exceeding the amount for which allowance has been made."

I also agree that Piute was not entitled to credit against Sevier's first priority for the following year for the other waters involved in this action, on the following grounds in

addition to those stated in the prevailing opinion and those stated by Mr. Justice WOLFE. Piute was not only limited in its right to claim such credit against Sevier's first priority for the following year, to waters released by the river commissioners pursuant to Section 2, subdivision (a) as pointed out above but also it was limited to and only had the right to claim credit for waters which were allocated to it or to which it had the right to store under the decree. In order to determine what waters Piute was entitled to credit out of Sevier's first priority for the following year we must determine what waters were allocated to Piute under the decree. The decree contains the following provisions:

"As between the owners of the Piute Reservoir and the owners of the Sevier Bridge Reservoir it is hereby ordered, adjudged and decreed that all of the waters of the Sevier River yielded above the Sevier Bridge Dam from all and every source whatever, *available for storage or use under their or any of their said water filings between October 1st of any year and October 1st of the succeeding year,* the following priorities and allocations of amounts shall govern:

"FIRST:
"Sevier Bridge Reservoir to receive 89,280 acre feet:

"SECOND:
"Piute Reservoir to receive 40,000 acre feet;

"THIRD:
"After the first and second above priorities and amounts have been satisfied, then of the next 32,000 acre feet or any part thereof available, 75% shall be allocated to Sevier Bridge Reservoir, and 25% to the Piute Reservoir;

"FOURTH:
"Sevier Bridge Reservoir shall receive all or any part of the next 18,720 acre feet available;

"FIFTH:
"Thereafter, of the next 75,000 acre feet, or any part thereof available, 75% shall be allocated to Sevier Bridge Reservoir and 25% to Piute Reservoir;

"SIXTH:
"All other or further water available shall be allocated 85% to Sevier Bridge Reservoir and 15% to Piute Reservoir." (Emphasis ours.)

These provisions of the decree cover not only the storage waters but also all waters yielded above the Sevier Bridge Reservoir either for storage or use, under any and all of the filings of the two reservoirs for a period commencing on October 1st, of one year to October 1st of the succeeding year. The contract on the other hand deals only with storage waters.

The Piute Reservoir capacity is 84,810 acre feet at the 80 foot contour level and 74,010 acre feet at the 76 foot contour level. The Sevier Bridge Reservoir will impound as much as 235,960 acre feet. If both reserviors were empty at the beginning of a year and each stored all of the water allocated to it under the decree until its reservoir was filled it would take all of the water allocated to the Piute Reservoir under the first five classifications of the decree and about 7,000 acre feet under the sixth classification thereof before its reservoir would be filled to the 76 foot contour level, at which time the Sevier Bridge Reservoir would lack about 10,000 acre feet of being full, but it would be more than filled before the Piute Reservoir would reach the 80 foot contour level.

Prior to the making of this decree the storage rights of each of these parties had two natural limitations: First, neither had acquired nor could acquire the right to store any water beyond the capacity of its storage facilities, and: Second, neither had or could acquire any right to store any water which rose below its dam and for that reason could not be stored in its reservoir. Thus, under the first proposition, Piute did not acquire any right to store any water in its reservoir beyond the quantity of water required to fill the same and maintain it full to the end of the season. Any water which ran by its dam at a time when the reservoir was full, and which it could not otherwise use at that time, was water to which it did not acquire any right to store because it did not have the capacity to place such water to a beneficial use. The same is true of waters which arose below its dam. Such water it could not impound in its reservoir and therefore could not store it and thus could

not acquire the right to store such water. Thus if it retained and stored in a given year all the water yielded above its dam which by natural flow could be diverted into its reservoir and therein retained and stored it would have the full amount of water which it could acquire the right to store in such reservoir during such year. Of course, it could and no doubt did acquire the right to use waters which it diverted below the dam and used for irrigation and other purposes by direct flow.

Such being the limitations of the rights of the parties prior to the adjudication, the decree must be read and interpreted in the light thereof. In making this decree the court was adjudicating the rights of the parties as they then existed, it was not creating new rights nor transferring rights from one party to another. Nor did it purport to create or transfer any such rights. Nor was it required to determine rights or limitations thereto, about which there was no dispute. Without expressly so stating, it did recognize these natural limitations, and made its formula for dividing the waters of this river system as between Piute and Sevier subject to these natural limitations. Thus the quantity of water which was allocated to Piute under this decree was not only limited by the provisions of the formula for the division of these waters but was also limited by these natural limitations as much as though the decree had expressly so provided.

Neither does the contract purport to or have the effect of making any change in the rights of these parties to the storage of the waters of this river. It simply recognized the rights of these parties as determined by the decree. Thus under the decree Piute had no right to storage waters beyond the capacity of its reservoir, and only had the right to store such waters as were yielded above its dam. The contract did not change these limitations on its rights to storage waters but simply dealt with such rights to storage waters as was allocated to it under the decree. The changes that it made was to authorize the River Commissioner to commence turning the water down from the Piute

Reservoir to the Sevier Reservoir on January 1st, instead of waiting until April 1st, in order to save the water that would be lost in transmission if held to the later date, and in case in so doing too much water was turned down so that Piute did not get its share of the storage waters in accordance with the decree, Piute was authorized to retain out of Sevier first priority for the next year a similar quantity of water as it failed to get the previous year. But Piute was not thereby entitled to any credit the following year for any water which it could not have stored in its reservoir the previous year, either on account of lack of capacity of its reservoir or on account of the failure of nature to yield sufficient water above its dam. This is true even though under the formula for dividing the water set out in the decree it would have been entitled to more storage water for that year than it actually did store.

WOLFE, Justice (concurring in part, dissenting in part).

I cannot concur in the result because the judgment asked for is one construing an agreement. I cannot altogether agree on the construction given the agreement by the CHIEF JUSTICE. I agree, however, with the conclusion that the amendment was properly allowed by the court because it did not set up entirely "new and independent" matters unrelated to the "cause of action," which I deem to be the holding of the *Hartford Accident & Indemnity Co.* v. *Clegg*, 103 Utah 414, 135 P. 2d 919, a broader concept than that stated by the CHIEF JUSTICE and one which I think we should not de-emphasize. I also agree that Piute could not get credit for any of the 13,226 acre feet during the succeeding year because its dam was entirely filled up to its allowable storage capacity at the time the said 13,226 acre feet were stored in the Sevier reservoir, but for reasons hereafter set out as to the 9,379 acre feet made between the dams, I do not think Piute could have taken credit for that against Sevier's allocation in the succeeding year, even if Piute's dam had not been full.

I think by the agreement of October 18, 1938, it was intended to permit waters arrested in the Piute dam which,

under the decree of November 30, 1936, could be held until April 15th of each year, to be transmitted to the Sevier dam after January 1st of each year or to permit waters which could be arrested until April 15th under the decree to by-pass the Piute dam for the purpose only of satisfying Sevier's priorities. Piute could not use the Sevier dam to store any of the waters to which it was entitled except waters let down in excess of those actually required to satisfy Sevier's priorities because of a wrong estimate of the probable make of the river between the dams. (Of course, I am not thinking of the case where someone might designingly let more water down than it was expected would be needed to satisfy Sevier's priorities. Such excess might, if fraudulent against Piute, be reclaimed as a credit by it against Sevier's next year's priority in any event regardless of the contract.)

I think section 2(a) of the contract clearly sets out the duty of the river commissioners under the contract and is supported by the parol evidence as to preceding events, and the purposes to be subserved by the contract. Section 2(b) of the contract then took care of mis-estimates. It appears to me that the word "or" in the clause reading "whether from excessive release of water from Piute Reservoir, *or* from accretions to the river below Piute Reservoir exceeding the amount for which allowance has been made," which seems to give the Chief Justice some difficulty, sets off the two different ways in regard to which a wrong estimate could be made. If the river commissioners after January 1st, when the snows would largely be still unmelted in the hills between Piute and Sevier, had underestimated the make of the river between the two dams as would be later revealed by the actual happening and let more water down than was necessary to satisfy Sevier's priorities that would be one type of wrong estimation. On the other hand an "excessive release of water from Piute Reservoir" might occur because it would be expected that the make of the river above Piute would replace all waters let down. Thus, if it was thought that the make of the river above Piute

would supply Piute's share of the Third Allocation as well as replace some of its 40,000 acre feet held on Second Allocation and for that reason the water was released to take care of all or some of Sevier's three-fourths of the Third Allocation, and it was found that the make of the river above Piute did not do that, a case would be presented where there was an excessive release from Piute which did not entail an excess of an amount for which allowance had been made regarding accretions between the dams. Other illustrations might be thought of to illustrate how the parties attempted to use language which would cover every possible situation which might occur within the framework of what they desire to accomplish.

I think the italicized part of the phrase "or from accretions to the river below Piute Reservoir *exceeding the amount for which allowance had been made*" (italics mine) shows that the parties had in mind for this arm of the alternative, a computation which involved an allowance or estimate of the make of the river between dams in determining the amount which was to be let down. However, there is a further potent reason why I do not think the interpretation of the contract given by the CHIEF JUSTICE in respect to the second arm of the alternative is correct. It is concluded by all of us that neither the decree nor the contract gave Piute any right to store waters in Sevier because of the limited capacity of her reservoir. I am accepting the figures set out in the opinion of Mr. Justice WADE that Piute would not be faced with that question until the sixth priority classification had been reached. But if nature had during a year been very bountiful with her snowfalls it might be reached. Also I think, and this appears to be the opinion of Mr. Justice WADE, that neither the decree nor the contract gave or intended to give Piute any storage rights in the Sevier Reservoir except for excess waters released. As far as the contract bears on such intent, I think section 2(a) conclusively governs as to what its intent was, i. e., to anticipate the situation which it was contemplated would transpire by April 15th. It had no other

purpose, the motive being to save losses due to late spring transmission of water. If Piute had no right to use Sevier as a storage for waters it follows that she could not use it for the storage of waters to which she might be entitled because of the make of the river between the dams. If the make above Piute was sufficient for her to capture *her* share of the make between the dams she could take her decreed storage rights of the *whole* river from what came into her reservoir.

I illustrate by a concrete case: If during a freak year the water commissioner had correctly estimated that the make of the river between the dams would be 100,000 acre feet and therefore no water was let down from Piute and it happened that Piute got only 30,000 acre feet from above her dam, she could not call upon Sevier next year for the extra 10,000 acre feet which Sevier got from the make of the river between the dams. But, if Piute had obtained her 40,000 acre feet from above her dam and say 2,500 acre feet more, Piute could keep the whole of the 2,500 acre feet because she could take into account the extra 10,000 which Sevier got and of which she would be entitled to 25% on the third allocation. In short, Piute would be entitled to 25% of 12,500 acre feet or 3,125 acre feet. But since only 2,500 of that came into her dam, she could get only that because she could not compel Sevier to store the remaining 625 acre feet which she could not capture.

Of course, Piute could not store any of the specific water which arose below its dam. But it appears to me that the decree intended to take the whole river above Sevier and allocate the storage rights according to specific priorities between Piute and Sevier. The river was considered as a unit. I am not familiar with the testimony which led to the decree but I can well conceive that it might have been such as to make it an equitable and practicable method of satisfying the storage rights of both reservoirs to pool the whole river *above* Sevier, taking account of the make of the river above Piute as a source to recoup its share of the make between the dams and adjusting the priorities so as to take account

of all factors. There may have been stipulations to that effect. In any event, the decree in specific language reads:

"As between the owners of the Piute Reservoir and the owners of the Sevier Bridge Reservoir it is hereby ordered, adjudged and decreed that all of the waters of the Sevier River yielded above the *Sevier Bridge Dam* from all and every source whatever, available for storage or use under their or any of their said water filings between October 1st of any year and October 1st of the succeeding year, the following priorities and allocations of amounts shall govern", etc.

Therefore, I do not think that the inability of Piute to capture specific waters below its dam was a limitation on its storage rights to said water. But the fact that it could not store in the Sevier reservoir its share of said specific water accruing to the river between the dams required it to capture its priorities from waters which flowed into *its* reservoir. But the pooling principle involving the *whole* of the river above Sevier could and would apply. The limitations therefore were, first: the capacities of the reservoirs; second: that Piute had no right to store in the Sevier reservoir any of the waters it was entitled to under the decree, whether derived from the make of the river between the dams or above Piute's dam. The contract of October 18, 1938, modified that to the extent that Sevier was to store until the following year waters which were let down in excess of what should have been let down if the parties had waited until after April 15th. Piute could then hold out of first priority of Sevier waters it would capture that following year, the amount of such released excess.

Mr. Justice WADE and I are in agreement as to the interpretation and extent of the contract of October 18, 1938, and I think we are in agreement on the point that Piute could take into account the make of the whole river including that between the two dams in applying the allocations provided by the decree but that its share of the whole river would have to be obtained from that water which came into its dam; that is, from the make of the river above its dam.

McDONOUGH, J., concurs with the views expressed in the opinion of Mr. Justice WOLFE.

PRATT, J., not participating.